NOTICE

Decision filed 07/15/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240339-U

NO. 5-24-0339

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Fayette County. |
| | ) | |
| v. | ) | No. 23-CF-181 |
| | ) | |
| MATTHEW W. SHAW, | ) | Honorable |
| | ) | Allan F. Lolie Jr., |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice Cates and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's grant of defendant's motion to suppress, where officers conducted an illegal search of defendant's residence, and information from that search was subsequently included in the application for a search warrant without an independent source of knowledge connecting defendant's residence to illegal activity.

¶ 2    The State appeals the Fayette County circuit court's order granting defendant Matthew Shaw's motion to suppress evidence. On appeal, the State argues that the court erred by granting defendant's motion, where police officers conducted a valid protective sweep. The State also contends that the court erred by finding that the search warrant obtained by the officers provided insufficient information for probable cause without the inclusion of information gathered during the protective sweep. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     On May 17, 2023, the State charged defendant by two-count information with: count I, unlawful possession of methamphetamine, less than five grams, a Class 3 felony (720 ILCS 646/60(a) (West 2022)), and count II, unlawful possession of drug paraphernalia, a Class A misdemeanor (720 ILCS 600/3.5(a) (West 2022)). The next day, the State added count III, unlawful delivery of methamphetamine, less than five grams, a Class 2 felony (720 ILCS 646/55(a)(1) (West 2022)). On June 14, 2023, and August 9, 2023, respectively, a grand jury indicted defendant on counts I and II.

¶ 5     On December 26, 2023, defendant filed a motion to suppress evidence. The motion to suppress indicated that on May 16, 2023, Sheriff Ronnie Stevens and Deputy Kyle Cook arrived at defendant's residence and asked to speak to defendant. Defendant answered the door and allowed both officers into his living room, where they proceeded to have a conversation that lasted about two minutes. The officers requested defendant's permission to search the home, and defendant denied them permission. When asked, defendant also denied that anyone else was in the residence.

¶ 6     After about four minutes of conversation in defendant's living room, defendant allowed Stevens and Cook into the dining room and kitchen of the residence so that defendant could retrieve his dinner before the officers escorted him outside. While outside, defendant was again asked if anyone else was in the home. Defendant again denied the presence of others in the home.

¶ 7     After defendant denied that anyone else was present, Deputy Cook reentered the home and proceeded to sweep it for the presence of other persons before a search warrant was issued. During his sweep of the residence, Deputy Cook searched the back bedroom of the house and observed a "crystal-like substance" lying on the bed.

2

¶ 8    In the motion to suppress, defendant first argued that Deputy Cook's search of his home was unreasonable under the fourth amendment of the United States Constitution (U.S. Const., amend. IV). Defendant argued that Deputy Cook's warrantless search of the residence was not based on a reasonable belief based on specific and articulable facts that defendant's home harbored any other person, and that no exigent circumstances warranted Cook's search of the back rooms. *Maryland v. Buie*, 494 U.S. 325 (1990). Defendant next argued that the search warrant that the officers later obtained was tainted by the information gathered from Cook's warrantless search, and that the warrant lacked probable cause to stand absent the information gathered from Cook's warrantless search. In support of his position, defendant relied on *People v. Burns*, 2015 IL App (4th) 140006. Finally, defendant argued that the remainder of the warrant was based on information from an informant and there was nothing in the warrant regarding the reliability or veracity of the informant. Therefore, defendant requested that the circuit court suppress all of the evidence obtained from the search of his home. This evidence included the crystalline substance, which later tested positive for methamphetamine, and the drug paraphernalia that Cook discovered in defendant's bedroom.

¶ 9    On February 26, 2024, the circuit court held a hearing on defendant's motion to suppress evidence. Defendant called Sheriff Ronnie Stevens of the Fayette County Sheriff's Office who testified first. Sheriff Stevens testified that prior to arriving at defendant's residence, the Fayette County Sheriff's Office was investigating Hardie Shafer. During that investigation, Investigator Robert Fritcher of the Fayette County Sheriff's Office conversed with Danny Dutton, who Fritcher encountered at Shafer's home. From that conversation, Fritcher notified Sheriff Stevens that he was going to obtain a warrant to search defendant's home. Stevens testified that when he and

Deputy Cook arrived at defendant's residence to secure the premises, they had not yet received a warrant.

¶ 10 Sheriff Stevens testified that he previously participated in several investigations at defendant's residence, including the execution of a warrant for harboring or aiding a fugitive. From his previous experiences with defendant, Stevens testified that he had known defendant to have multiple other individuals residing with him. Stevens testified that when he arrived at the residence with Deputy Cook on May 16, 2023, only defendant's vehicle was present outside. After defendant responded to Stevens knocking at his door, Stevens testified that defendant allowed both he and Deputy Cook into the residence.

¶ 11 Sheriff Stevens testified that he and Deputy Cook stood in the living room of defendant's residence for "probably more than five minutes, if not ten." When asked if there was anyone else in the living room, Stevens testified, "we didn't see anybody else in the living room." When asked if Stevens was allowed to proceed further into the residence, Stevens testified, "I asked for consent to search, which [defendant] denied, and Investigator Fritcher had enough information that he was going to obtain a warrant." When Stevens was asked if defendant allowed him into the kitchen area of the residence, Stevens testified, "I believe I followed him in there so he could get some food."

¶ 12 Sheriff Stevens then testified that he could not hear anyone in the residence, but Deputy Cook proceeded to conduct a warrantless search of defendant's residence to look for persons:

> "[State's Attorney]: Approximately how long were you in the residence during that time, between come—arriving into the living room and going into the kitchen?
>
> [Stevens]: Without looking at my bodycam I would say, at the most, ten or 15 minutes.

[State's Attorney]: At that time did you ask Matt Shaw if anybody else was present in the residence?

[Stevens]: I believe I did, yes.

[State's Attorney]: Did he deny anybody else being in the residence?

[Stevens]: He did.

[State's Attorney]: Was there any indication that there was anybody else present in the residence?

[Stevens]: We did not hear anybody at the time.

[State's Attorney]: Was there a search of the residence prior to having the search warrant in hand?

[Stevens]: Looking for persons.

[State's Attorney]: Did you conduct that search?

[Stevens]: No, I did not.

[State's Attorney]: Did Deputy Kyle Cook conduct that search?

[Stevens]: Yes, he did.

[State's Attorney]: Are you aware if he found anything?

[Stevens]: When he came out he said he observed narcotics in the master bedroom.

[State's Attorney]: As far as you are aware, was the information provided to another deputy in order to get the search warrant?

[Stevens]: It was."

¶ 13     Sheriff Stevens testified that defendant's home was a single-level residence he estimated to be about 1,200 square feet. Stevens emphasized that there was no indication that anybody else was present in the home with them:

"[State's Attorney]: Matt denied consent to search the residence; is that correct?

5

[Stevens]: That is correct.

[State's Attorney]: Was there any indication that anybody else was present in the home before you entered the residence?

[Stevens]: Not at that time.

[State's Attorney]: You didn't see anybody arrive and enter the home before you entered the residence?

[Stevens]: No, I did not.

[State's Attorney]: In the five to ten minutes you were there having a discussion with Matt Shaw, was there any indication that anybody else was in the home, based on your—

[Stevens]: No, ma'am."

¶ 14　On inquiry from the circuit court, Stevens clarified that he took defendant outside the residence while Deputy Cook conducted his search of the residence. When asked why there was a need to search the residence when defendant was no longer inside of it, Stevens testified, "For the—if there was anybody else hiding, Your Honor." Stevens further testified that there was "no indication" of a weapon in defendant's residence.

¶ 15　After Sheriff Stevens's testimony, the circuit court admitted the bodycam footage from both Sheriff Stevens and Deputy Cook into evidence. Defendant stipulated to the admission of the footage. The court took judicial notice of the search warrant. At defendant's request, the court found that defendant met his burden of showing a *prima facie* case of an illegal search and shifted the burden of proof to the State.

¶ 16　The State called Investigator Robert Fritcher of the Fayette County Sheriff's Office. Fritcher testified that he had been involved in an investigation concerning Danny Dutton. After conducting a search of Dutton's person, Fritcher testified that he located just under a gram of methamphetamine. Fritcher testified that he handcuffed and detained Dutton on suspected

6

possession of methamphetamine. Fritcher testified that Dutton told him he received the methamphetamine from defendant.

> "[State's Attorney]: Where did he tell you he got that methamphetamine from?
>
> [Fritcher]: [Dutton] advised he was down at [defendant] Matthew Shaw's house, helping him do yard work at his residence, and Matthew Shaw gave him the bag of methamphetamine for helping him."

¶ 17    Investigator Fritcher further testified that Dutton advised that defendant was upset about a "broken glass methamphetamine pipe" being in defendant's residence. Dutton also advised Fritcher that defendant was "using" again, and Fritcher testified that Dutton based his knowledge on "being with Mr. Shaw in his vehicle, driving Mr. Shaw around in Shaw's vehicle." Fritcher testified that he never interviewed Dutton before, that Dutton was not a professional informant, and that Dutton never provided Fritcher with any other information that could justify that his statements were reliable.

¶ 18    From this information, Investigator Fritcher testified that he sought a search warrant against defendant's residence. In Fritcher's affidavit for a search warrant, he stated the following:

> "1.    I, Robert Fritcher, am a Drug Investigator with the Fayette County Sheriff's Office.
> 2.    On May 16th, 2023[,] during investigation Danny Dutton was found to be in Possession of Methamphetamine in his pocket at 1414 W Madison St in Vandalia Illinois.
> 3.    I then read Danny Miranda warning and advised he understood.
> 4.    Danny then advised he was with Matthew Shaw all day and Matthew had given Danny the baggy of methamphetamine for helping him at his residence. Danny advised that Matthew Shaw is using hypodermic needles again and was mad about a glass methamphetamine pipe that was broken at the residence.
> 5.    Danny advised he has been driving Matthew around in the pick-up truck listed above and has seen paraphernalia inside the truck.
> 6.    Deputy Kyle Cook went to Matthew Shaw residence and detained Matthew for obtaining a search warrant. During clearing of the residence Deputy Kyle Cook advised there was a baggy of crystal like substance was seen in plain view on a bedroom mattress believed to be Matthew Shaw bedroom.

7

7.      From my training and experience and cooperation of witnesses on scene I believe Matthew Shaw has more methamphetamine located at the residence and paraphernalia at the residence."

¶ 19    The State next called Deputy Kyle Cook of the Fayette County Sheriff's Office. Deputy Cook testified that on May 16, 2023, he and Sheriff Stevens went to defendant's residence, where defendant answered the door and allowed them both inside the residence. Cook testified that after he first entered defendant's residence, he spoke to defendant for "a few minutes," and that while they were talking, Cook entered defendant's kitchen on the far side of the residence. While they walked from the living room to the kitchen, Cook testified that he could see down the hallway but had no indication there was anyone in the home.

¶ 20    Deputy Cook testified that when he arrived at defendant's residence, there was only one vehicle outside. Cook further testified that he did not see anyone else enter the residence before he and Sheriff Stevens went to the door. Cook testified that while he was in the residence with defendant, he did not "notice or hear anybody else" in the residence. Nevertheless, Cook testified that he performed a procedure called a "sweep of the home."

"[State's Attorney]: Why did you do that?

[Cook]: Looking to see if anyone else was in the residence."

¶ 21    Deputy Cook testified that he "only looked anywhere a person might be hiding," and that while searching defendant's bedroom, he noticed a crystalline substance on the bed which he believed to be methamphetamine based on "[his] past experience of dealing with methamphetamine."

¶ 22    Following testimony, defense counsel first argued that, based on their testimony, neither Sheriff Stevens nor Deputy Cook could articulate any specific facts to justify their belief that defendant was harboring someone else in his residence. Further, the officers could not justify a

8

belief that there was any sort of present or potential harm to the officers. Therefore, defendant argued, the officers conducted an unlawful search of his home.

¶ 23    Defense counsel next argued that Deputy Cook's alleged observation of a crystalline substance in defendant's bedroom was improperly included in Investigator Fritcher's application for a warrant. Specifically, counsel argued that Fritcher's interview with Dutton was not sufficient by itself to have received the search warrant or have probable cause for the search warrant. Defense counsel argued that there was no information regarding the reliability of Dutton, as he was being held on potential methamphetamine charges. There was no additional corroboration in the warrant application, other than what was observed by Cook, to indicate that Dutton had previously given reliable information.

¶ 24    The State responded and argued that Deputy Cook performed a valid "protective sweep," because his search was "conducted to protect the safety of police officers or others," and his search was "narrowly confined to a cursory visual inspection of those places which a person might be hiding." The court interrupted the State's argument and expressed skepticism that Deputy Cook conducted his search for safety reasons.

> "THE COURT: Any time they go talk to anybody who might be a suspect, and they have them outside on their porch, they can go in the house and make sure there's nobody in the house?
>
> [State's Attorney]: No, but I believe the issue here is they are in the process of getting a search warrant. And as Sheriff Stevens testified, there had been issues with Mr. Shaw allowing individuals to reside in his home, he had rented out a room before, they were aware of all of that information. He had previously been charged with harboring a fugitive, so they have all of this information when they are going into this home. They know that Mr. Shaw could potentially have someone else in the home. The purpose of them going to talk to Mr. Shaw was to secure the home for purposes of a search warrant, which is why they did the cursory sweep."

¶ 25    The State continued its argument, noting that even without the information that Deputy Cook gave to Investigator Fritcher prior to Fritcher's application for a warrant, there was sufficient

9

information for the court to find probable cause to grant the warrant. The court took the arguments under advisement and adjourned the hearing.

¶ 26    On March 1, 2024, the circuit court entered a written order granting defendant's motion to suppress. The court noted:

"There is no real dispute as to the evidence in this case. There are two legal issues in this case. First, was Deputy Cook's protective sweep of the Defendant's home for officer safety authorized while a search warrant was being sought? Second, if said protective sweep of the Defendant's residence was not allowed, was Danny Dutton's statement to Investigator Fritcher alone sufficient for the issuance of the search warrant?"

¶ 27    The court first addressed the issue of whether Deputy Cook's search was permitted under the circumstances. The court determined:

"Had the Defendant been under arrest, the protective sweep would have clearly been legal. In this case, the Defendant was not under arrest, did not authorize the search and the officers were not securing the home awaiting the search warrant because the information from the protective sweep was used to procure the warrant.

All witnesses testified that they had no reason to believe anyone else was present in the Defendant's residence. Despite the Defendant's past arrest for harboring a fugitive, there was no reason to believe that anyone else was in the Defendant's home or that he had committed a violent crime.

*** The court finds that the methamphetamine observed during the protective sweep was illegally located and could not be used to secure the warrant."

¶ 28    The court then examined whether Danny Dutton's statement alone was sufficient to justify the issuance of a search warrant for defendant's residence. The court noted that the State claimed that because Dutton was not a confidential source, Investigator Fritcher, the search warrant affiant, was not required to provide information in the affidavit that the informant was reliable or credible. The court noted that the "affidavit provided no information as to Dutton's reliability." The court

determined that there "was no corroboration of Dutton's statement other than the protective sweep of the Defendant's residence."

¶ 29 The circuit court reviewed Investigator Fritcher's affidavit, which stated:

"4. Danny then advised he was with Matthew Shaw all day and Matthew had given Danny the baggy [*sic*] of methamphetamine for helping him at his residence. Danny advised that Matthew Shaw is using hypodermic syringes again and was mad about a glass methamphetamine pipe that was broken at the residence. 5. Danny advised he has been driving Matthew around in the pick-up [*sic*] truck listed above and has seen paraphernalia inside the truck."

¶ 30 The circuit court then set out a list of "several things that are not included in the affidavit at issue:

1. The affidavit does not state that Danny Dutton received the methamphetamine from the Defendant at the Defendant's residence.
2. The affidavit does not state that Danny Dutton was inside the Defendant's residence.
3. The affidavit does not state that Danny Dutton saw the alleged broken methamphetamine pipe.
4. The affidavit does not state that Danny Dutton even had a reasonable belief that the Defendant had more methamphetamine at his residence.
5. The Affidavit refers to the truck, but it never states that the Defendant owned the truck and that is the only place that Danny Dutton saw 'paraphernalia.'
6. The affidavit does not state what sort of paraphernalia.
7. Although the captions of the search warrant, the complaint and the affidavit mention the truck, Investigator Fritcher never included the truck in the places to be searched.
8. Additionally, the issuing judge did not authorize the search of the truck which was the one place where there was evidence of some sort of criminal activity.
9. The Affidavit did not state that Investigator Fritcher knew the Defendant to have previously possessed methamphetamine.
10. The Affidavit contained no statement of corroboration (excluding that of Deputy Cook) of Danny Dutton's statement to police.
11. There was no evidence presented that the issuing judge was presented with other evidence outside of the four corners of the affidavit."

11

¶ 31    The circuit court noted, that if "the affidavit had addressed even a few of the above-listed concerns, the court would deny the Motion to Suppress since the informant was named and not confidential." The court concluded: "Without more information and without the ability to consider the illegally discovered evidence by Deputy Cook, the court would be required to make too many assumptions to believe additional methamphetamine would be located in the Defendant's residence to issue a warrant." For these reasons, the court concluded that "[w]ithout Deputy Cook's discovery, the court finds that the totality of the circumstances did not present sufficient evidence for the issuance of the search warrant." As such, the court granted defendant's motion to suppress.

¶ 32    On March 4, 2024, the State filed a timely notice of appeal.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, the State argues that the circuit court erred by granting defendant's motion to suppress evidence where police officers conducted a valid protective sweep. The State also contends that the court erred by finding that the search warrant obtained by the officers provided insufficient information for probable cause without the inclusion of information gathered during the protective sweep. Specifically, the State contends that the affidavit provided for the issuance of a search warrant, because it provided a sufficient connection between Dutton and defendant's residence. For the reasons that follow, we affirm.

¶ 35                                 A. Protective Sweep

¶ 36    First, the State argues that the circuit court erred by granting defendant's motion to suppress evidence where police officers conducted a valid protective sweep. Defendant responds, arguing that the officers conducted an impermissible warrantless search of defendant's home, because their search was not conducted incident to an arrest and because the officers failed to provide any

12

articulable facts indicating a threat posed by persons inside the home. Initially, we note that neither party disputes the circuit court's finding that defendant did not consent to a search of his home.

¶ 37 Our standard of review in ruling on a suppression motion is a two-part standard that gives deference to the circuit court's factual findings but considers the circuit court's ultimate ruling on the motion *de novo*. *People v. Hagestedt*, 2025 IL 130286, ¶ 14. In giving deference to the circuit court's factual findings, we reverse those findings only if they are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Our deference to the circuit court's factual findings "is grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony." *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) (citing *People v. Gonzalez*, 184 Ill. 2d 402, 412 (1998)). If we accept the circuit court's factual findings, we review *de novo* whether suppression is warranted under those facts. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003) (citing *Gonzalez*, 184 Ill. 2d at 412).

¶ 38 "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The fourth amendment of the United States Constitution, applicable to the states through the due process clause of the fourteenth amendment, guarantees to all citizens the right to be free from unreasonable searches and seizures." *In re Lakisha M.*, 227 Ill. 2d 259, 264 (2008).

¶ 39 A warrantless search is presumptively unreasonable unless it falls within the scope of a recognized exception. *Katz v. United States*, 389 U.S. 347, 357 (1967). "In Illinois, those few exceptions are (1) a search based on consent, (2) a search incident to arrest, and (3) a search

13

predicated upon probable cause where there are exigent circumstances which make it impractical to obtain a warrant." *People v. Harrell*, 226 Ill. App. 3d 866, 872 (1992). "[C]ourts are precluded from admitting evidence that is gathered by government officers in violation of the fourth amendment." *People v. Lampitok*, 207 Ill. 2d 231, 241 (2003) (citing *Mapp v. Ohio*, 367 U.S. 643, 649 (1961)).

¶ 40    "In reviewing the propriety of a warrantless entry into a private residence under claimed exigent circumstances, the guiding principle is reasonableness, and each case must be decided on its own facts." *People v. Davis*, 398 Ill. App. 3d 940, 948 (2010) (citing *People v. Foskey*, 136 Ill. 2d 66, 75-76 (1990)). "The circumstances must militate against delay and justify the officers' decision to proceed without a warrant." *Foskey*, 136 Ill. 2d at 75. If the facts known to law enforcement officers do not "suggest the immediacy and real threat of current danger or likelihood of flight," they are insufficient to support a finding of exigency. *Id.* at 83-84.

¶ 41    The burden of demonstrating exigent need for a warrantless search or arrest is on the State. *Foskey*, 136 Ill. 2d at 75. In the case at bar, the State argues that the officers conducted a lawful "protective sweep" as set forth in *Maryland v. Buie*, 494 U.S. 325 (1990). A protective sweep must be conducted on the basis and within the scope of an officer's reasonably held belief that the area to be searched harbors an individual posing a danger to those on the premises. *Id.* This belief must be based on specific and articulable facts known to the officer at the time of the sweep. *Id.*

¶ 42    "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id*. at 327. As held in *Buie*, a particular species of exigency arises when a "searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on [an] arrest scene." *Id.* at 337.

14

¶ 43    In *Buie*, the Court crafted a limited intrusion aimed at recognizing an officer's particular interest in assuring themselves "that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* at 333. "A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime." *Id.*

¶ 44    If police have probable cause to search a house but have not obtained a warrant, the search must fall within one of the narrow and specifically delineated exceptions to the warrant requirement. *Thompson v. Louisiana*, 469 U.S. 17, 21 (1984). Absent any of the narrowly limited exceptions to the search warrant requirement, police who believe they have probable cause cannot search a home without a warrant merely because they plan to get one. *People v. Carter*, 2016 IL App (3d) 140958, ¶ 33 (quoting *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir. 1974)).

¶ 45    No party disputes the circuit court's finding that defendant was not under arrest at the time Cook conducted his protective sweep. Therefore, the exigent circumstance envisioned by *Buie* and argued by the State cannot apply here. Our analysis therefore turns to whether there were other exigent circumstances which would have made it impractical for the officer to obtain a warrant prior to conducting the search.

¶ 46    Based on the facts and evidence before us, the circuit court reasonably concluded that the State failed to prove a reasonable suspicion that defendant's home contained an individual posing a real and current danger to the officers. Specifically, the State argued, "Stevens's execution of a previous search warrant for harboring a fugitive at defendant's home had provided Stevens with a reasonable belief that defendant could have multiple people residing with him simultaneously." However, the State's position is rebutted by the record, where neither Sheriff Stevens nor Deputy

Cook articulated any specific observation to support a belief that another individual was in defendant's residence and that they faced an immediate and real threat of current danger. Officer Cook testified, "I didn't have anything to believe that there could be or there could not be [someone else in the home] as I had never been there before." Moreover, Officer Cook stood in defendant's living room for nearly four minutes, and walked deep into the home behind defendant, all while sweeping the home with his flashlight before Sheriff Stevens removed defendant from his home and Cook continued his search in private.

¶ 47 The State contends that the only "search" of the residence which took place prior to the issuance of a warrant was "looking for persons." However, defendant did not consent to a search of his home, and the officers did not have a warrant to arrest defendant or search his home. Defendant's past conviction for harboring a fugitive does not forever exile him from the safeguards of the fourth amendment. The State's assertion on appeal that the officers had "personal knowledge relative to the *historical* presence of other people in the home" (emphasis added) does not suggest a real and immediate threat of current danger, and therefore did not constitute an exigent circumstance to search defendant's home without a warrant.

¶ 48 For these reasons, the circuit court's finding that the methamphetamine observed by Deputy Cook in his sweep of defendant's residence was illegally located and could not be used to secure the warrant was not against the manifest weight of the evidence. Accordingly, Cook's sweep was an illegal search of defendant's home, where defendant was not under arrest and there were no other exigent circumstance to justify a warrantless search of defendant's home without defendant's consent.

16

¶ 49                                    B. Search Warrant

¶ 50    Next, the State argues the circuit court erred by finding that the search warrant lacked probable cause without the information gathered during the illegal search. Specifically, the State contends that the affidavit provided a sufficient connection between Dutton and defendant's residence. Defendant responds, arguing that the circuit court correctly granted his motion to suppress where Investigator Fritcher's affidavit failed the independent source doctrine. For the reasons that follow, we affirm the circuit court's determination that "the totality of the circumstances did not present sufficient evidence for the issuance of the search warrant."

¶ 51    Where improper information is included in a warrant application, the warrant is valid so long as the properly included information is sufficient to establish probable cause for the warrant. *People v. Chambers*, 2016 IL 117911, ¶ 93. Where a search is unlawful, the exclusionary rule provides that evidence improperly obtained must be suppressed. *People v. Rojas*, 2013 IL App (1st) 113780, ¶ 15. Evidence obtained during an illegal search may not serve as the basis for issuing a search warrant, and a search warrant obtained based on evidence discovered during an illegal search should be quashed. *Davis*, 398 Ill. App. 3d at 958 (citing *People v. Crowder*, 99 Ill. App. 3d 500, 504 (1981)).

¶ 52    One exception to the exclusionary rule is the "independent source" doctrine. *People v. Durgan*, 281 Ill. App. 3d 863, 867 (1996); see also *Murray v. United States*, 487 U.S. 533, 537 (1988). In Illinois, a warrant-authorized search is independent of a previous warrantless search if (1) the illegal search did not influence the officer's decision to seek the warrant, and (2) the information obtained from the illegal search did not affect the court's decision to issue the warrant. *People v. Carter*, 284 Ill. App. 3d 745, 752 (1996) (citing *People v. Bielawski*, 255 Ill. App. 3d 635, 641 (1994), *overruled on other grounds by People v. Johnson*, 208 Ill. 2d 118 (2003)).

17

¶ 53   "The long-standing rule has been that, where information that should not have been considered has been included in a successful warrant application, the warrant itself is not invalid as long as the properly included information suffices to establish probable cause for the warrant." *Bielawski*, 255 Ill. App. 3d at 642 (citing *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978); *United States v. Alexander*, 761 F.2d 1294, 1299-1300 (9th Cir. 1985)). Illinois's adoption of the independent source doctrine did not alter that rule. *Id.* Nevertheless, the independent source doctrine imposes an "onerous burden" on the State to convince the circuit court "that no information gained from the illegal entry" influenced the officer's decision to seek a warrant or the court's decision to grant it. *Murray*, 487 U.S. at 540.

¶ 54   Initially, we consider whether the affidavit provided a sufficient connection between Dutton and defendant's residence. According to the State, Dutton was with defendant and possessed methamphetamine allegedly received from defendant, which ultimately led Investigator Fritcher to seek a warrant. According to the State, this constituted an "individually sufficient basis for probable cause" apart from the evidence obtained during the protective sweep. We disagree.

¶ 55   In its written order, the circuit court noted that the affidavit failed to state that Dutton received methamphetamine from defendant at defendant's residence. Moreover, the court noted that the affidavit did not state that Dutton was inside defendant's residence. The affidavit did not state that Dutton saw the broken methamphetamine pipe. It failed to state that Dutton "even had a reasonable belief that the Defendant had more methamphetamine at his residence." The affidavit "never states that the Defendant owned the truck" which was the only place that Dutton saw alleged paraphernalia. The court also concluded that the affidavit contained "no statement of corroboration" of Dutton's statement to police. Therefore, the court concluded that "[w]ithout more information and without the ability to consider the illegally discovered evidence by Deputy

18

Cook, the court would be required to make too many assumptions to believe additional methamphetamine would be located in the Defendant's residence to issue a warrant." We cannot say that this finding was in error, where it is supported by the evidence and testimony before us on appeal.

¶ 56    In response to the State's brief, defendant argued that this issue is "appropriately governed by the independent source doctrine as articulated in *Murray v. United States*, 487 U.S. 533 (1988)." Thus, we first consider whether the illegal search influenced the officer's decision to seek the warrant. In Investigator Fritcher's affidavit and testimony, the only information he claimed to have concerning illegal activity at defendant's residence prior to receiving the results of Cook's sweep was (1) that Danny Dutton stated that defendant "was mad about a glass methamphetamine pipe that was broken at the residence" and (2) that Dutton had claimed to have received methamphetamine from defendant "for helping him at his residence." The record demonstrates that the decision to apply for a warrant was made prior to the officers' arrival at defendant's residence. This is why officers arrived at the home in the first place. Sheriff Stevens and Deputy Cook were waiting for the warrant when they initially contacted defendant and ultimately conducted a "protective sweep" of the home. Thus, based on the record before us, we cannot say that the illegal search influenced the initial decision to seek a warrant.

¶ 57    We must consider next whether the information obtained from the illegal search affected the court's decision to issue the warrant. The standard for determining whether some piece of improper information has influenced an officer's decision to seek a warrant is an objective one. See *Bielawski*, 255 Ill. App. 3d at 641-42 (holding that whether improperly obtained information influenced the court's decision to grant a warrant is an objective standard). The State argues the case at bar is comparable to *Bielawski*, where the court held that an officer's demonstrated intent

19

to obtain a warrant prior to making an illegal entry could be sufficient for a circuit court to find that the subsequent entry did not influence the officer's ultimate decision to seek the warrant. *Id.* at 643-44. We find *Bielawski* distinguishable from the case before us, where in *Bielawski*, the information the officer obtained from his prior lawful entry was "objectively sufficient to support the issuance of the warrant" and improper information was not ultimately included in the officers' warrant application. *Id.* at 643.

¶ 58    Instead, we find our prior decision in *Carter*, 284 Ill. App. 3d 745, instructive. There, this court held that an officer's demonstrated intent to forgo seeking a warrant was sufficient evidence for a circuit court to find that the officer's illegal entry influenced the ultimate decision to seek a warrant. *Id.* at 756. In that case, a maintenance worker discovered cannabis plants in an apartment, of which he informed the police. *Id.* at 748. When the officers arrived, they observed the cannabis plants in plain view through an outside window of the apartment. *Id.* Rather than seeking a warrant, the officers chose to enter and search the apartment illegally and remained in the apartment waiting for defendant's return for over two hours. *Id.* When the occupant returned to his home, the officers asked his consent for a search, which he refused. *Id.* It was only then that the officers demonstrated any intent to seek a warrant. *Id.* at 749. The officers did not include any information they had acquired from their unlawful search in their affidavit for a search warrant, so the circuit court held that the officers' decision to obtain a warrant was not affected by their illegal search. *Id.* at 750, 753.

¶ 59    In that instance, this court overturned the circuit court's finding that the officers' decision to seek a warrant was independent of their illegal entry merely because their affidavit omitted the illegally obtained information. *Id.* at 753. In doing so, we determined that circuit courts must consider the officer's intent, as demonstrated by the totality of their actions, when determining if

20

an illegal entry influenced an officer's decision to obtain a warrant. *Id.* Though the officers may have had probable cause to obtain a warrant from what they saw prior to their warrantless entry, they chose to proceed without a warrant regardless. *Id.* at 754. This demonstrated the officers' intent to seek defendant's consent to search the residence and thereby shortcut the procedural burden of obtaining a lawful warrant. *Id.*

¶ 60 As noted above, the court specifically articulated 11 facts that were not included in the affidavit. The court expressly noted, "Without more information and without the ability to consider the illegally discovered evidence by Deputy Cook, the court would be required to make too many assumptions to believe additional methamphetamine would be located in the Defendant's residence to issue a warrant." Based on the record and evidence before us, we cannot say that this conclusion was in error.

¶ 61 For these reasons, we find that the circuit court properly granted defendant's motion to suppress, where information from the search was subsequently included in the application for a search warrant without an independent source of knowledge connecting defendant's residence to illegal activity.

¶ 62                                III. CONCLUSION

¶ 63 For these reasons, we affirm the Fayette County circuit court's grant of defendant's motion to suppress.


¶ 64 Affirmed.

21